Filed 3/27/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY DAVID ALLEN FRIDAY,<br><br>    Defendant and Appellant. | H039404<br>(Santa Clara County<br>Super. Ct. No. C1240683) |

Penal Code section 1203.067 requires any person placed on probation for a registerable sex offense to waive the privilege against self-incrimination and waive the psychotherapist-patient privilege. This case concerns the constitutionality of requiring these waivers as probation conditions.

First, we hold that the condition requiring a waiver of the privilege against self-incrimination is prohibited by the Fifth Amendment under *Minnesota v. Murphy* (1984) 465 U.S. 420 ("Our decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege."). (Accord *United States v. Saechao* (9th Cir. 2005) 418 F.3d 1073; *United States v. Antelope* (9th Cir. 2005) 395 F.3d 1128; *State v. Eccles* (1994) 179 Ariz. 226.)

Second, we construe the waiver of the psychotherapist-patient privilege as requiring waiver only insofar as necessary to enable communication between the probation officer and the psychotherapist. We hold that the waiver as construed in this fashion is not overbroad in violation of defendant's constitutional right to privacy.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Jeffrey David Allen Friday pleaded no contest to possession of child pornography, which he had downloaded to his computer. (Pen. Code, § 311.11, subd. (a).)[1] The record contains almost no facts about the offense. It occurred on or about August 2, 2012. The trial court found "this is a matter which was initiated by a search warrant on the defendant's computer looking for child porn. It has been determined that he had been downloading since he was 14 or 15 . . . ." Defendant was 19 at the time of the offense. The parties stipulated to a factual basis in the police reports, but the record contains no reports. Because the offense involved "no identifiable victim," the probation officer did not assess defendant's level of risk as a future offender. Defendant had suffered no prior convictions.

Defendant entered into a plea agreement by which he pleaded no contest to the charged offense in exchange for six months in county jail with no early release.[2] The court suspended imposition of the sentence and granted a three-year term of probation, including six months in county jail and mandatory participation in a sex offender management program as probation conditions.

The court ordered the following five probation conditions, among others, requiring defendant: (1) to waive any privilege against self-incrimination and participate in polygraph examinations, which must be part of the sex offender management program; (2) to waive any psychotherapist/patient privilege to enable communication between the sex offender management professional and the probation officer; (3) not to purchase or possess any pornographic or sexually explicit material as it relates to minors, as defined by the probation officer; (4) not to possess or use any data encryption technique program;

---

[1] Subsequent undesignated statutory references are to the Penal Code.
[2] The plea agreement applied only to the length of time in custody, not to the imposition of probation or any probation condition.

and (5) not to frequent, be employed by, or engage in any business where pornographic materials are openly exhibited. As to the waivers of the privilege against self-incrimination and the psychotherapist-patient privilege, the court ordered these conditions as mandated by section 1203.067.

At sentencing, defendant lodged two objections relevant here. He objected on Fifth Amendment grounds to the waiver of his privilege against self-incrimination. He objected on overbreadth grounds to the condition that he not purchase or possess pornographic material. The trial court overruled defendant's objections.

## II. DISCUSSION

On appeal, defendant contends the probation conditions requiring waiver of the privilege against self-incrimination and waiver of the psychotherapist-patient privilege are overbroad in violation of his constitutional rights. He also challenges as overbroad the condition requiring him to participate in polygraph examinations. Lastly, he challenges as vague and lacking in scienter requirements the conditions prohibiting purchase or possession of pornography, possession or use of data encryption, and frequenting businesses where pornography is exhibited.

A. *The Statutory Scheme and Applicable Regulations*

Under section 1203.067, subdivision (b)(2), any person placed on formal probation on or after July 1, 2012, for any offense requiring registration under sections 290 through 290.023, "shall successfully complete a sex offender management program, following the standards developed pursuant to Section 9003, as a condition of release from probation."[3] Subdivision (b)(3) requires "Waiver of any privilege against self-

---

[3] Section 1203.067, subdivision (b)(1), also requires persons placed on probation for registrable sex offenses prior to July 1, 2012 to participate in a sex offender management program. The waivers at issue in this case do not apply retroactively to probationers whose crimes occurred before the September 9, 2010 effective date of the amendment that added the waivers. (*People v. Douglas M.* (2013) 220 Cal.App.4th 1068, 1077.)

3

incrimination and participation in polygraph examinations, which shall be part of the sex offender management program." Subdivision (b)(4) requires "Waiver of any psychotherapist-patient privilege to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09."[4]

The Legislature enacted these provisions in 2010 to amend the Sex Offender Punishment, Control, and Containment Act of 2006 (hereafter, the "Containment Act"). (Stats. 2010, ch. 219, § 17.) The Containment Act created "a standardized, statewide system to identify, assess, monitor and contain known sex offenders for the purpose of reducing the risk of recidivism posed by these offenders, thereby protecting victims and potential victims from future harm." (§ 290.03, subd. (b), Stats. 2006, ch. 337, § 12.) Before the 2010 amendment, persons placed on probation for certain sex crimes were placed in "an appropriate treatment program designed to deal with child molestation or sexual offenders . . . ." (§ 1203.067, former subd. (b), Stats. 1994, ch. 918, § 1.) The 2010 amendment removed this provision; the Containment Act now requires participation in an "approved sex offender management program" certified by the California Sex Offender Management Board (CASOMB). (§ 9003.)

Under section 9003, CASOMB promulgates standards for certification of sex offender management programs and "sex offender management professionals." (§ 9003, subds. (a) & (b).) Such programs "shall include treatment, as specified, and dynamic and future violence risk assessments pursuant to Section 290.09." (§ 9003, subd. (b).) Furthermore, sex offender management programs "shall include polygraph examinations by a certified polygraph examiner, which shall be conducted as needed during the period that the offender is in the sex offender management program." (*Ibid.*)

_____

[4] The same two waiver conditions apply to parolees. (§ 3008, subds. (d)(3) & (d)(4).)

4

Section 290.09 specifies that "The certified sex offender management professional shall communicate with the offender's probation officer or parole agent on a regular basis, but at least once a month, about the offender's progress in the program and dynamic risk assessment issues, and shall share pertinent information with the certified polygraph examiner as required." (§ 290.09, subd. (c).) Section 290.09 further requires the sex offender management professional to administer a State-Authorized Risk Assessment Tool for Sex Offenders (SARATSO) in two forms—the "SARATSO dynamic tool" and the "SARATSO future violence tool"—and to send the person's scores on these tests to the probation officer. (§ 290.09, subd. (b)(2).) The probation officer must then transmit the scores to the Department of Justice, which makes the scores accessible to law enforcement officials through the Department's website. (*Ibid.*)

Section 9003 requires CASOMB to publish on its website the certification requirements for sex offender management programs and professionals.[5] To be certified under these standards, sex offender management programs must implement a "Containment Model" approach to managing sex offenders. (Cal. Sex Offender Management Bd., Sex Offender Treatment Program Certification Requirements at p. 6.)[6] The central goal of the Containment Model is "community and victim safety, a goal which is supported by adopting a victim-centered perspective on all aspects of sex offender management." (*Ibid.*) The model is implemented by a "Containment Team," whose members include the probation officer, the treatment provider, and the polygraph examiner. (*Id.* at p. 2.) "On a regular basis or on an as-needed basis, the containment

[5] We take judicial notice of these materials. (Evid. Code, §§ 452, 459.) Pursuant to Evidence Code section 455, subdivision (a), we requested letter briefs on the propriety of taking judicial notice of these documents. Neither party objected. Contemporary copies of the cited documents have been placed on file with the clerk of the court.

[6] This document is online at: <http://www.cce.csus.edu/portal/admin/handouts/CASOMB Program 10-29-13 complete.pdf> [as of Mar.27, 2014].

5

team may also include others who play an important role in the management of any specific offender.  These may include representatives of law enforcement . . . ."  (*Id.* at p. 6.)

The Containment Model "stresses the importance of open ongoing collaboration between these key players."  (Cal. Sex Offender Management Bd., Sex Offender Treatment Program Certification Requirements, *supra*, at p. 6.)  The "core elements" of the model include "[a]uthoritative criminal justice supervision and monitoring [. . .] to exert external control over offenders.  Probation and parole agencies apply pressure through clear expectations and through the use or threatened use of sanctions to ensure that the offender complies with supervision conditions, including participation in specialized treatment."  (*Ibid.*)  In contradiction to the language of section 1203.067, the standards state that "Invocation of the Fifth Amendment right to not incriminate oneself during a sexual history polygraph cannot legally result in revocation."  (*Id.* at p. 7.)  Additionally, "Polygraph examinations are used to enhance the assessment process and to help monitor the sex offender's deviant fantasies and external behaviors, including access to potential victims."  (*Ibid.*)

All polygraph examiners working with a certified sex offender management program must meet CASOMB-promulgated certification standards, published on the CASOMB website.  (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards at p. 1.)[7]  The standards set forth a model policy, program goals, the various types of examinations to be administered, and the types of questions that examinations should include, among other criteria.  Examinations should last at least 90 minutes, and examiners may test a probationer up to five times in one day.  (*Id.* at p. 6.)

---

[7] This document is online at: <http://www.casomb.org/docs/Polygraph_Standards_FINAL.PDF> [as of Mar. 27, 2014].

6

However, examiners should not administer more than four separate examinations to the same probationer in one year, "except where unavoidable or required by law or local regulation. This does not include re-testing due to a lack of resolution during an initial or follow-up examination." (*Ibid.*)

Although examiners "should have the final authority and responsibility for the determination of test questions and question language," the examiner should communicate with other team members about what questions to ask. (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards, *supra*, at pp. 9-11.) The results of certain exams and the information gained from them should be provided to other team members. (*Id.* at p. 12.) Furthermore, "Except as provided by law, information from the polygraph examination and test results (outcomes) should be kept confidential and provided only to those involved in the containment approach to the supervision and treatment of sex offenders." (*Id.* at p. 5.) Examiners, however, "should not interfere with or circumvent the efforts of any open or ongoing investigation of a new criminal allegation." (*Ibid.*)

The several types of polygraph examinations include "instant offense exams," "prior-allegation exams," "sexual history disclosure exams," and "sex offense monitoring exams," as well as subcategories of these exams. (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards, *supra*, at p. 10.) These exams have explicitly investigative components. Instant offense exams may be used "to test the limits of an examinee's admitted behavior and to search for other behaviors or offenses not included in the allegations made by the victim of the instant offense." (*Id.* at p. 11.) "Examiners, along with the other members of the community supervision team, should select relevant targets from their concerns regarding additional or unreported offense behaviors in the context of the instant offense." (*Ibid.*) Questions about illegal conduct are not limited to sex offenses; they may include, but are not limited to, questions about the use or distribution of illegal drugs or controlled substances. (*Id.* at p. 21.)

7

The prior-allegation exam is used to probe prior alleged offenses, regardless of whether the probationer was charged with these alleged offenses. "Examiners should use the Prior Allegation Exam (PAE) to investigate and resolve all prior alleged sex offenses (i.e., allegations made prior to the current conviction) before attempting to investigate and resolve an examinee's history of unknown sexual offenses." (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards, *supra*, at p. 12.) Similarly, the sexual history exams should be used "to investigate the examinee's history of involvement in unknown or unreported offenses and other sexual compulsivity, sexual pre-occupation, or sexual deviancy behaviors." (*Ibid.*) To discover "unreported victims," examiners should "thoroughly investigate the examinee's lifetime history of sexually victimizing others, including behaviors related to victim selection, victim access, victim impact, and sexual offenses against unreported persons." (*Id.* at p. 13.) The sex offense monitoring exam may be used at the request of other team members "to explore the possibility the examinee may have been involved in unlawful sexual behaviors including a sexual re-offense" during the period of supervision. (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards, *supra*, at p. 22.)

Examiners should make a complete audio-visual or audio recording of all exams. (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards, *supra*, at p. 25.) Furthermore, "Examiners should obtain an examinee's agreement, in writing and/or on the audio/video recording, to a waiver/release statement." The language of this "agreement" should include, among other things, "1) the examinee's voluntary consent to take the test, 2) that the examination may be terminated at any time, [. . .] 4) that all information and results will be released to professional members of the community supervision team, 5) an advisement that admission of involvement in unlawful activities will not be concealed from the referring professionals[,] and 6) a

8

statement regarding the requirement for audio/video recording of each examination."[8] (*Ibid.*) The standards advise, "Examiners should exercise caution to ensure they do not violate any rights of examinees regarding answering questions about criminal behaviors." (*Id.* at p. 9.) But the document provides no description of those rights and no explanation for how an examiner should reconcile this advice with any other standards. The standards do not require examiners to undergo legal training on this or any other issue.

B. *Waiver of Any Privilege Against Self-Incrimination*

By requiring a "[w]aiver of any privilege against self-incrimination," section 1203.067, subdivision (b)(3) implicates defendant's rights under the Fifth Amendment's Self-Incrimination Clause.[9] To determine the effect of the waiver, we first examine the general contours of the implicated rights. We then consider the reach of those rights in the probation context.

1. *The Privilege Against Self-Incrimination*

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself . . . ." (U.S. Const., 5th Amend.) The Self-Incrimination Clause thereby protects one from being forced to testify against oneself in a criminal proceeding. "[B]ut it does more than that." (*Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704, 714 (*Spielbauer*).) As the United States Supreme Court has recognized, "The privilege reflects a complex of our

---

[8] The standards do not address the waiver requirements of sections 1203.067 or 3008.

[9] The Fifth Amendment applies to the states via the Fourteenth Amendment. (*Malloy v. Hogan* (1964) 378 U.S. 1.) State law also provides rights against self-incrimination. (Cal. Const., art. 1, § 15; Evid. Code, § 940; *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 372 ["[T]he California Constitution continues to afford criminal defendants an independent source of protection from infringement of certain rights, including the privilege against self-incrimination."].) Because we strike down the waiver requirement on federal constitutional grounds, we need not consider the reach of state law regarding self-incrimination.

fundamental values and aspirations, and marks an important advance in the development of our liberty. It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used. This Court has been zealous to safeguard the values which underlie the privilege." (*Kastigar v. United States* (1972) 406 U.S. 441, 444-445, fns. omitted (*Kastigar*).)

One may invoke the privilege against self-incrimination absent initiation of a criminal proceeding. (*Chavez v. Martinez* (2003) 538 U.S. 760, 770-771 (plur. opn. of Thomas, J.) (*Chavez*).) "It has long been held that this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' " (*Minnesota v. Murphy, supra,* 465 U.S. at p. 426 (*Murphy*).) Moreover, "One cannot be forced to choose between forfeiting the privilege, on the one hand, or asserting it and suffering a penalty for doing so on the other." (*Spielbauer, supra,* 45 Cal.4th at p. 714.)

Notwithstanding these protections, the Self-Incrimination Clause does not provide an absolute right to remain silent. A witness may be compelled to testify—even if doing so is self-incriminating—provided the state does not use the testimony, or evidence derived from it, in a criminal prosecution of that witness. (*Kastigar*, *supra*, at p. 462.) This is commonly called "use and derivative use immunity."[10] (*Id.* at p. 443.) Consistent with these principles, state and federal statutes empower prosecutors to grant immunity to

_____

[10] By contrast, "transactional immunity" guarantees against any prosecution for the implicated offense, even without use of the witness's statements. (*People v. Campbell* (1982) 137 Cal.App.3d 867, 874.) In this opinion, we use the term "immunity" to refer only to use and derivative use immunity.

10

a witness prospectively while compelling his or her testimony under threat of contempt. (§§ 1324, 1324.1; 18 U.S.C. § 6001 et seq.) Immunity under the Fifth Amendment further extends to statements compelled outside formal testimonial settings, and it may apply absent a formal grant of immunity. (*Garrity v. New Jersey* (1967) 385 U.S. 493, 495 [police officers' compelled statements in response to state investigation could not be used against them in criminal prosecutions, even without a formal grant of immunity]; *Spielbauer, supra,* 45 Cal.4th at p. 729 [public defender required to make statements in response to employer's investigation enjoys immunity even absent a formal grant of immunity].)

Because the probation condition at issue here requires waiver of "*any* privilege against self-incrimination," (italics added), the plain language necessarily requires defendant to forgo any claim of immunity. Without the privilege against self-incrimination, there is no right to immunity.[11] If the statute were somehow construed *not* to require a waiver of immunity, it is unclear what else the waiver would accomplish or what purpose it would serve. As explained in detail below, the state does not need a waiver to require defendant's participation in treatment or polygraph examinations. He can be compelled to answer questions—even if the answers are incriminating—provided he retains immunity from the use of his statements in a separate criminal prosecution.

2. *Ripeness of the Claim Under the Fifth Amendment*

The Attorney General contends the claim is not ripe. She argues that the Fifth Amendment would only be violated if defendant's incriminating statements were used against him in a criminal prosecution. Because defendant has not identified any such use of his statements, the Attorney General contends he has no Fifth Amendment claim. But

---

[11] Indeed, under the plain language of the statute, the loss of immunity is the primary effect of the waiver. (See *Chavez, supra*, 538 U.S. at pp. 769-771 (plur. opn. of Thomas, J.).)

the Attorney General does not explain how defendant could protect his Fifth Amendment rights in a future criminal proceeding after expressly waiving these rights as a condition of probation. "Once an immunity waiver is signed, the signatory is unable to assert a Fifth Amendment objection to the subsequent use of his statements in a criminal case, even if his statements were in fact compelled. A waiver of immunity is therefore a prospective waiver of the core self-incrimination right in any subsequent criminal proceeding . . . ." (*Chavez*, *supra*, 538 U.S. at p. 768, fn.2 (plur. opn. of Thomas, J.).)

Thus, a state-compelled, prospective waiver of the privilege against self-incrimination gives rise to a Fifth Amendment claim *before* a declarant's incriminating statements are used in a criminal prosecution, regardless of whether the state ever initiates such a prosecution. The Supreme Court's longstanding "penalty cases" jurisprudence established this rule decades ago. (*Sanitation Men v. Sanitation Comm'r* (1968) 392 U.S. 280, 283 [Fifth Amendment violated when state fired public employees for invoking and refusing to waive the privilege against self-incrimination]; *Gardner v. Broderick* (1968) 392 U.S. 273, 276 [Fifth Amendment prohibits state from firing policeman for refusing to waive the privilege against self-incrimination].)

In *Lefkowitz v. Turley* (1973) 414 U.S. 70, licensed architects challenged a New York statute disqualifying contractors for public contracts if they refused to waive their Fifth Amendment immunity. The architects, when called as witnesses before a grand jury, refused to sign waivers of immunity. The state had not charged them with any crimes, nor used their statements against them in any criminal proceeding. Nonetheless, the Supreme Court held that the statutorily compelled waivers violated the Self-Incrimination Clause. The Supreme Court again reaffirmed this principle in *Lefkowitz v. Cunningham* (1977) 431 U.S. 801. There, a New York statute provided that if a political party officer was subpoenaed to testify about the conduct of his office but the officer refused to testify or waive immunity, the officer was barred from office for five years. Cunningham, when subpoenaed to testify before a grand jury, refused to sign a waiver of

12

immunity, and he was barred from office. The state never threatened or attempted to use Cunningham's statements against him in a criminal prosecution, yet the Supreme Court struck down the statute as a violation of the Self-Incrimination Clause. These cases make clear that a state-compelled, prospective waiver of immunity violates the Self-Incrimination Clause apart from the use of the compelled statements in any criminal proceeding.

The Attorney General relies on language in *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112 (*Maldonado*) for the proposition that the Fifth Amendment is not violated until a defendant's statements are used against him in a criminal proceeding. But her reliance on this language ignores the analytical distinction between a violation of the "core" Fifth Amendment right and a violation of the "prophylactic" protection prohibiting a compelled waiver of immunity as explained in *Maldonado* and *Chavez*.

In *Maldonado*, the California Supreme Court stated that "a '*core*' Fifth Amendment violation is completed, not merely by official extraction of self-incriminatory answers from one *who has not waived the privilege*, but only if and when those answers are used in a criminal proceeding against the person who gave them." (*Maldonado*, *supra*, 53 Cal.4th at p. 1128.) (Italics added.) For this principle, the court relied on *Chavez*, *supra*, 538 U.S. at pp. 766-773 (plur. opn. of Thomas, J.).

In *Chavez*, the United States Supreme Court considered a civil rights lawsuit under 42 U.S.C. section 1983 by a plaintiff alleging a violation of the Fifth Amendment. Although the plaintiff's statements were compelled, they were never used against him in a criminal prosecution. (*Chavez*, *supra*, 538 U.S. at pp. 763-764.) Justice Thomas, writing for a plurality of justices, characterized the "core" Fifth Amendment privilege as the right not to be a "witness" against oneself in a "criminal case." (*Chavez*, at pp. 768-769 (plur. opn. of Thomas, J.).) But a majority of justices also affirmed longstanding "prophylactic" or "complementary" protections under the Fifth Amendment that arise prior to and apart from a criminal proceeding. (*Id.* at p. 770 (plur. opn. of Thomas, J.); *id.*

13

at pp. 777-778 (conc. opn. of Souter, J.).)  The rule prohibiting a compelled waiver of immunity is one such protection, and is necessary to protect the "core" right against the use of compelled statements in a prosecution.  "By allowing a witness to insist on an immunity agreement before being compelled to give incriminating testimony in a noncriminal case, the privilege preserves the core Fifth Amendment right from invasion by the use of that compelled testimony in a subsequent criminal case."  (*Id.* at p. 771 (plur. opn. of Thomas, J.).)

The California Supreme Court in *Maldonado* did not hold otherwise.  There, the court considered a discovery rule requiring a defendant who proffered a mental incapacitation defense to submit to examination by the prosecution's mental health experts.  (§ 1054.3, subd. (b)(1).)  The court had no occasion to consider a compelled waiver.  To the contrary, the court explicitly based its analysis on the uncontroversial premise that the defendant maintained his Fifth Amendment immunity unless and until he voluntarily waived it by introducing his own statements into evidence at trial:  "[T]he parties agree that the Fifth Amendment protects petitioner against any direct or derivative use of his statements to the prosecution examiners, except to rebut any mental-state evidence he presents through his own experts."  (*Maldonado*, *supra*, 53 Cal.4th at p. 1129, fn. omitted.)  "If he decides to abandon the defense, any self-incriminating results of the examinations cannot be introduced or otherwise used against him."  (*Id.* at p. 1132.)

Nothing in *Maldonado* authorizes a compelled waiver of immunity.  To the contrary, the California Supreme Court explicitly recognized the *Chavez* plurality's affirmation of the so-called "prophylactic rules," (*Maldonado*, *supra*, at pp. 1128-1129), under the Fifth Amendment:  "The rule allowing a witness to assert the privilege prior to testifying, and to refuse to testify unless granted immunity, Justice Thomas indicated, protects the 'core' Fifth Amendment privilege simply *by assuring that the witness has not forfeited the right against self-incriminating use of his or her testimony in later criminal*

14

*proceedings.*" (*Ibid.*) (Italics added.) The court in *Maldonado* also acknowledged its prior holding, set forth at *Spielbauer*, *supra*, 45 Cal. 4th at pages 714-730, that a compelled waiver of immunity could not be required even in the absence of a criminal proceeding. In this regard, our high court noted, "[W]e held that in the context of a *noncriminal investigation* by a public employer, the employee could be compelled to answer questions about his performance of duty, even without a formal immunity agreement, *so long as he was not required to surrender the immunity conferred by the Fifth Amendment itself* against use and derivative use of his statements to prosecute him for a criminal offense." (*Maldonado*, *supra*, at p. 1129.) (Italics added.)

Neither *Maldonado* nor *Chavez* purported to overturn the longstanding United States Supreme Court doctrine prohibiting compelled waivers of immunity.[12] Regardless of whether the right against a compelled waiver is characterized as a "core right," a "prophylactic rule," or "complementary protection," defendant has standing to assert his Fifth Amendment claim here. The *Chavez* plurality stated this explicitly: "That the privilege is a prophylactic one does not alter our penalty cases jurisprudence, which allows such privilege to be asserted prior to, and outside of, criminal proceedings." (*Chavez*, *supra*, 538 U.S. at p. 772, fn. 3 (plur. opn. of Thomas, J.).)[13]

---

[12] The Ninth Circuit Court of Appeals recognized this as well. "[T]he government contends that *Chavez* stands for the proposition that Antelope may not assert the Fifth Amendment right until the moment a compelled statement is used in a criminal proceeding against him. But *Chavez* did not, as the government suggests, unseat decades of Supreme Court law. Instead, the government's argument reveals a fundamental misunderstanding of *Chavez*." (*United States v. Antelope*, *supra*, 395 F.3d at p. 1140.)

[13] Defendant also contends the required waiver is unconstitutionally overbroad as a probation condition apart from any specific Fifth Amendment violation. California law does not require a probationer to suffer a probation revocation or any other harm before challenging a probation condition as overbroad. It would be inconsistent to do so here simply because defendant's claim implicates the Fifth Amendment. Indeed, defendant challenges three other probation conditions in this case as unconstitutionally vague

(*Cont.*)

15

For these reasons, we conclude defendant's claim under the Fifth Amendment is ripe for adjudication here.

3. *The Privilege Against Self-Incrimination in the Context of Probation*

"Inherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled." ' [Citation.] Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." (*United States v. Knights* (2001) 534 U.S. 112, 119.) " 'Nevertheless, probationers are not divested of all constitutional rights.' " (*People v. Pirali* (2013) 217 Cal.App.4th 1341, 1350.) "A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.)

The United States Supreme Court has held the protection of the Self-Incrimination Clause, unlike the Fourth Amendment, applies to both prisoners and probationers. "A defendant does not lose this protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." (*Murphy*, *supra*, 465 U.S. at p. 426.) A blanket waiver of any privilege against self-incrimination would deprive a probationer of the full spectrum of his rights under the Self-Incrimination Clause—even those protections enjoyed by prisoners in custody. (*Baxter v. Palmigiano* (1976) 425 U.S. 308, 316 [prison inmates compelled to testify at disciplinary proceedings must be offered immunity and may not be required to waive it];

---

because they lack a scienter requirement. We routinely adjudicate these types of claims—prior to the revocation of probation—without any concern for ripeness.

16

*McKune v. Lile* (2002) 536 U.S. 24, 36 (plur. opn. of Kennedy, J.) ["The privilege against self-incrimination does not terminate at the jailhouse door . . . ."].)

In *Murphy*, Marshall Murphy was prosecuted for criminal sexual conduct. He pleaded guilty to false imprisonment and received three years' probation. (*Murphy*, *supra*, 465 U.S. at p. 422.) The terms of Murphy's probation required him to participate in a treatment program for sexual offenders, to report to his probation officer as directed, and to be truthful with the probation officer "in all matters." (*Ibid.*) In the course of his treatment, Murphy confessed to raping and murdering a teenage girl seven years earlier. (*Id.* at p. 423.) His treatment counselor gave this information to the probation officer, who then confronted Murphy with it. (*Id.* at pp. 423-424.) Murphy confessed to the probation officer as well, who in turn told the police. (*Id.* at p. 424.) At no point did Murphy invoke the Fifth Amendment. He was later indicted for first degree murder. (*Id.* at p. 425.)

The high court found Murphy had voluntarily waived his right against self-incrimination. (*Murphy*, 465 U.S. at p. 429.) First, the court began its analysis by holding that the privilege against self-incrimination applies to probationers. (*Id.* at p. 426.) The court then held that the probation condition requiring Murphy to answer questions truthfully did not, by itself, controvert this right; rather, his obligations were no different from those of any other witness in a proceeding. "The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer *over his valid claim of the privilege*." (*Id.* at p. 427.) (Italics added.) The court then distinguished Murphy's circumstances from cases in which "the state not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege . . . ." (*Id.* at p. 434 [citing *Lefkowitz v. Turley*, *supra*, 414 U.S., at pp. 79-84 ["a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself."]; *Sanitation Men v. Sanitation*

17

*Comm'r*, *supra*, 392 U.S. at pp. 283-284; *Gardner v. Broderick*, *supra*, 392 U.S. at pp. 278-279].) "The threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony." (*Murphy*, 465 U.S. at p. 435.) Because the state did not punish Murphy for relying on the privilege or induce him to forgo it, the court found no Fifth Amendment violation. (*Id.* at p. 436.)

The court also found Murphy could not have reasonably believed that he could be punished for invoking the privilege because the law clearly prohibited such punishment. (*Id.* at p. 438.) "Our decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege. It is not surprising, then, that neither the State court nor any State officer has suggested otherwise." (*Ibid.*) Thus, *Murphy* explicitly protects a probationer's right to invoke the Fifth Amendment.

The Attorney General quotes language in a footnote in *Murphy* stating, "Just as there is no right to a jury trial before probation may be revoked, neither is the privilege against compelled self-incrimination available to a probationer." (*Murphy*, *supra*, 465 U.S. at p. 435, fn. 7.) The context of the quote, however, makes clear that the court was referring solely to the absence of a right to invoke the privilege against self-incrimination in a revocation proceeding in response to inquiries about one's probationary status, such as questions about residence requirements. Such questions "pose[] no realistic threat of incrimination in a separate criminal proceeding." (*Ibid.*) Moreover, the court continued, "[A] state may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination. Under such circumstances, a probationer's 'right to immunity as a result of his compelled testimony would not be at stake,' [citations] . . . ." (*Ibid.*)

18

Thus, *Murphy* has long made clear that the use of a probationer's compelled statements in a separate criminal proceeding would violate the Fifth Amendment, and the state may not punish a probationer for invoking the Fifth Amendment. More recently, California courts have reaffirmed that *Murphy* stands for this principle. "[I]f the state puts questions to a probationer that call for answers that would incriminate him in a pending or later criminal proceeding, and expressly or by implication asserts that invocation of the privilege would lead to revocation of probation, the answers would be deemed compelled under the Fifth Amendment and thus involuntary and inadmissible in a criminal prosecution." (*Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 320 (*Brown*); accord *United States v. Saechao*, *supra*, 418 F.3d 1073; *United States v. Antelope*, *supra*, 395 F.3d 1128.)

We will examine the breadth of the waiver under section 1203.067, subdivision (b)(3), in accordance with these principles.

4. *Overbreadth of the Waiver of the Privilege Against Self-Incrimination Under Section 1203.067, Subdivision (b)(3)*

Because the waiver of the privilege against self-incrimination imposes limitation's on a probationer's constitutional rights, it must be "closely tailored" to its purposes. (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.) Neither the language of the waiver provision nor the legislative history of the amendment that enacted it specifically states its purpose. As a general matter, public safety is "a primary goal" of court-ordered probation conditions. (§ 1202.7; *People v. Olguin* (2008) 45 Cal.4th 375, 379.) Consistent with this goal, the overriding purpose of the sex offender treatment program is public safety through containment and reduction of recidivism by registered sex offenders: "For the safety and well-being of California's citizens, especially those most vulnerable to sexual assault, it is essential to manage known sex offenders living in the state's communities in ways that most effectively reduce the likelihood that they will commit another offense . . . ." (Cal. Sex Offender Management Bd., Sex Offender Treatment Program

19

Certification Requirements, *supra*, at p. 1.) Treatment and rehabilitation of the offender are secondary purposes of the sex offender management program; CASOMB publications emphasize the importance of their role in reducing recidivism. (*Ibid.*) Public safety is also the primary goal of polygraph testing as part of the sex offender management program. (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards, *supra*, at p. 3.)

The reach of the waiver is extraordinarily broad. Subdivision (b)(3) of section 1203.067 requires waiver of "*any* privilege against self-incrimination . . . ." (Italics added.) By use of the word "any" to modify the term "privilege," the statute precludes all attempts by a probationer, present and future, to seek protection under the Self-Incrimination Clause for compelled statements made during the sex offender management program, regardless of the circumstances in which they may arise. The statute thereby encompasses a complete waiver of immunity under the Fifth Amendment.[14]

As to subject matter, the statute imposes no limits on either the topic or the time frame of statements that may come under the waiver. The waiver is not limited to statements about the offense for which the probationer has been convicted. Anything the probationer says could be used against him in any criminal proceeding, whether in the instant proceeding or any other. Because the waiver eliminates derivative use immunity, his statements could even be used against him in a future criminal prosecution for an

---

[14] At oral argument, the Attorney General argued that the waiver condition does not prevent the probationer from invoking the privilege against self-incrimination, even after the probationer has been required to waive it. We cannot conceive of—and the Attorney General did not put forth—any logical way to reconcile this position. The waiver condition would be meaningless if a probationer could simply nullify it by invoking the privilege at a later time. For the waiver to have any legal force, it must mean the probationer cannot meaningfully invoke the privilege in connection with the sex offender management program.

20

offense he commits *after* the expiration of the probationary period. (*Marchetti v. United States* (1968) 390 U.S. 39, 53; *Prudhomme v. Superior Court* (1970) 2 Cal.3d 320, 326 [abrogated on other grounds] [the privilege forbids compelled disclosures which could serve as a "link in a chain" of evidence tending to establish guilt of a criminal offense].)

Under this broad waiver, a probationer could be compelled to confess to a crime committed long ago, having no relevance to his status as a sex offender. Any such confession could be given to police or prosecutors, who could then use it against the probationer to initiate an independent prosecution. And law enforcement officials seeking to further an independent, on-going prosecution for an unrelated crime could be tempted to contact the probation officer and ask that the probationer be questioned about it. The probationer could then be questioned aggressively in a custodial environment, without *Miranda* warnings, and any claim that his or her statements were coerced or involuntary under the Self-Incrimination Clause would be waived.[15] These are only a few examples of the potential problems that could ensue from such a broad and indiscriminate waiver of the privileges against self-incrimination.

And we cannot effectively cabin the scope of the statute through the proper application of the principles of statutory construction. Arguably, because the statute requires "Waiver of any privilege against self-incrimination *and participation in polygraph examinations, which shall be part of the sex offender management program*" (italics added), the latter conditions could be construed as limiting the waiver solely to

___

[15] The Self-Incrimination Clause provides for the rights set forth in *Miranda v. Arizona* (1966) 384 U.S. 436, as well as a right against the extraction of coerced, involuntary confessions. "No doubt the constitutional privilege may, on occasion, save a guilty man from his just deserts. It was aimed at a more far-reaching evil—a recurrence of the Inquisition and the Star Chamber, even if not in their stark brutality. Prevention of the greater evil was deemed of more importance than occurrence of the lesser evil. Having had much experience with a tendency in human nature to abuse power, the Founders sought to close the doors against like future abuses by law-enforcing agencies." (*Ullmann v. United States* (1956) 350 U.S. 422, 428.)

statements made during a polygraph examination or during the course of the sex offender management program. But such a construction would still provide almost no meaningful constraints. First, the statute would still place no limits on the subject matter of a probationer's statements subject to the waiver or the questions that could be put to the probationer. This would allow for questions about all aspects of a probationer's past and present conduct, whether criminal or otherwise, regardless of whether it has any relevance to the instant offense or a probationer's status as a sex offender. Second, there would still be no statutory limitation on who may formulate questions, to whom the answers may be given, or for what use they may be available.

A polygraph examiner, for example, could question the probationer, in the course of a video-recorded examination, about matters not directly related to his sex offense, such as involvement with illegal drugs. (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards, *supra*, at p. 21.) The examiner could then provide the recording directly to the probation officer or even to law enforcement for use in a criminal prosecution against the probationer. (Evid. Code, § 351.1, subd. (b) ["Nothing in this section is intended to exclude from evidence statements made during a polygraph examination which are otherwise admissible."].) None of this is forbidden under a plain interpretation of the statute. To the contrary, various standards set forth in CASOMB publications encourage such a chain of events. Although CASOMB standards for polygraph examiners state that information from polygraph exams "*should* be kept confidential and provided only to those involved in the containment approach to the supervision and treatment of sex offenders," the standards also make clear that law enforcement officials may be made part of the "Containment Team." (Cal. Sex Offender Management Bd., Sex Offender Treatment Program Certification Requirements, *supra*, at p. 6.) (Italics added.) More importantly, the statute contains no language reflecting any restrictions on providing information to law enforcement officials.

22

To the contrary, other statutes explicitly *require* certain members of the Containment Team to reveal the probationer's statements to law enforcement for further investigation and prosecution. For example, probation officers, psychotherapists, district attorneys and police officers are all "mandated reporters" under the Child Abuse and Neglect Reporting Act. (§ 11165.7, subds. (a)(15), (a)(18), (a)(21), & (a)(34).) If any of these participants acquire knowledge—or even reasonable suspicion—of any child who has been the victim of child abuse or neglect, the participant is required to report the information to police or other qualified agencies. Failure to do so is a misdemeanor punishable by up to six months confinement in a county jail or by a fine of one thousand dollars, or by both. (§ 11166.)

In conjunction with mandatory reporting requirements and CASOMB standards, a blanket waiver of any privilege against self-incrimination results in a process whereby *suspected* offenses based on compelled statements—including those unrelated to the underlying offense—are effectively required to be presented for prosecution. First, the probationer, upon threat of revocation, would be compelled to submit to a polygraph examination. The examiner would then pose a raft of questions purposely designed to ferret out both past and current sexual misconduct. The probationer would be forced to waive his privilege against self-incrimination and answer the questions. The examiner, consistent with CASOMB standards, would then be required to share the results of the examination with the probation officer or the prosecutor. These participants, in turn, would be compelled to report to the police any information constituting reasonable suspicion that the probationer has committed any one of numerous offenses defined as

23

child abuse and neglect.[16]  The results of this process could then be used against the probationer in a subsequent criminal prosecution.

There is no doubt that, in the abstract, a waiver of the privilege against self-incrimination would further public safety if it allowed for the prosecution of a sex offender who admits to an ongoing, dangerous offense that would otherwise go unreported after invocation of the privilege.  But the scope of the waiver at issue here reaches too broadly.  It allows, for example, use of a probationer's statements in the prosecution of *any* offense—such as minor drug offenses or prostitution-related activities.[17]

If the only purpose of the waiver is to compel the probationer to answer questions and participate in treatment, no waiver is necessary.  As the high court observed in *Murphy*, the Fifth Amendment already allows the state to require a probationer to participate in treatment and answer questions truthfully.  (*Murphy*, *supra*, 465 U.S. at p. 427.)  Probationers may also be required to undergo polygraph testing, provided the questioning relates to successful completion of the therapy program and the crime for which the defendant is convicted.  (*Brown*, *supra*, 101 Cal.App.4th at p. 321; *People v. Miller* (1989) 208 Cal.App.3d 1311, 1315 ["The mere requirement of taking the test in itself is insufficient to constitute an infringement of the privilege."].)  And, if the circumstances surrounding the questioning are noncustodial, no *Miranda* warnings are

---

[16] Presumably, "reasonable suspicion" could even include a probationer's denials, if the results of the polygraph exam indicated the probationer was lying.  (See, e.g., *People v. Lara* (1974) 12 Cal.3d 903, 909.)

[17] CASOMB-promulgated standards specifically advise polygraph examiners to inquire about past "prostitution activities" and use of drugs, among other illegal conduct.  (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards, *supra*, at pp. 17, 21.)

required.[18] (*Murphy*, *supra*, at p. 433.) If the probationer does not invoke the privilege against self-incrimination, the privilege is waived voluntarily. Absent some other restriction, then, a probationer's statements may be used against him or her in a separate criminal prosecution. (*Id.* at p. 440.)[19] Furthermore, if a probationer invokes the privilege in response to questions that pose no threat of self-incrimination (e.g., questions concerning his probationary status), the state may revoke probation without violating the Fifth Amendment. (*Id.* at p. 435, fn. 7.) In light of these allowances, there is no overwhelming need for a compelled waiver of defendant's fundamental right to his privilege against self-incrimination.

Arguably, a waiver of the privilege against self-incrimination could also serve the secondary purposes of treatment and rehabilitation by encouraging a probationer to reveal and discuss mental dysfunctions with the psychotherapist. However, for these purposes, the state has another option: it can compel a probationer to disclose incriminating information, even after invocation of the Fifth Amendment, by granting him immunity. Indeed, doing so would greatly encourage the probationer to engage with the psychotherapist by ensuring that any facts revealed would not lead to imprisonment.[20] By contrast, a waiver explicitly allowing a probationer's statements to be used against the

---

[18] The First District Court of Appeal has also held that an in-custody, un-*Mirandized* probationer's statements may be used against him in a revocation proceeding. (*People v. Racklin* (2011) 195 Cal.App.4th 872, 881.)

[19] See also *People v. Macias* (1997) 16 Cal.4th 739, 757 [trial court properly allowed impeachment with statements defendant voluntarily made to probation officer in preparation for fitness hearing]; *People v. Goodner* (1992) 7 Cal.App.4th 1324, 1332 [statements to probation officer could be used to prove elements of prior conviction for sentence enhancement purposes].)

[20] Under use and derivative use immunity, the state could still prosecute the probationer for offenses revealed to a psychotherapist, provided the prosecution is based solely on independently obtained evidence.

probationer in a subsequent criminal prosecution may tend to discourage honesty and openness between the probationer and the psychotherapist.

For the reasons above, we conclude the Fifth Amendment prohibits the section 1203.067, subdivision (b)(3) requirement of a waiver of the privilege against self-incrimination as a condition of probation. (Accord *State v. Eccles*, *supra*, 179 Ariz. 226.)

The Attorney General, anticipating we might find the waiver overbroad, proposes two modifications to narrow it. One proposed modification would limit the subject matter of questions that could be posed to those "in furtherance of the defendant's successful completion of the sex offender management program, his/her current probation supervision period, his/her sexual history, and state-mandated assessments of his/her risk of reoffending." But the probation condition is mandated by statute. It is not the proper role of this court to fashion modifications that have no basis in the plain language of the statute; these are questions better left to the Legislature.

A second proposed modification would provide that "any answer that the defendant provides after invoking his/her Fifth Amendment privilege will not be used in any future prosecution or violation of probation as long as it is solely based on a new criminal offense which occurred prior to the conviction of the current offense." Thus the Attorney General invites us to incorporate an automatic immunity provision for past offenses. Presumably, then, a prosecutor could use the probationer's statements against him in a criminal prosecution of any ongoing or future offense.

But an automatic grant of immunity could create unanticipated difficulties in a prosecution for past offenses, thereby harming efforts to protect public safety. Suppose a probationer, after being required to waive the privilege against self-incrimination, then reveals a history of numerous past serious and violent offenses for which he has been granted immunity automatically under the Attorney General's proposed rule. Any prosecution for such offenses—even if the prosecutor never intended for the defendant to be questioned about them—could be substantially compromised. "[A] defendant against

26

whom incriminating evidence has been obtained through a grant of immunity may be in a stronger position at trial than a defendant who asserts a Fifth Amendment coerced-confession claim. One raising a claim under this [immunity] statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." (*Kastigar*, *supra*, 406 U.S. at pp. 461-462.) In many such cases, public safety may be better served where a prosecutor retains the discretion whether to grant immunity. It would thus be unwise for this court to construe the statute as allowing an automatic immunity mechanism for past offenses, as suggested by the Attorney General.

Mindful of these complications, we do not here opine on the effect, on future or independent prosecutions, of compelling defendant's statements as part of the sex offender management program in the absence of the waiver. "The issue before us [. . .] does not directly implicate the latter problem." (*Spielbauer*, *supra*, 45 Cal.4th at p. 728.) We hold only that the state may not require the waiver of "any privilege against self-incrimination" as a condition of probation as set forth in section 1203.067, subdivision (b)(3).

5. *The Dissent and People v. Garcia*

The dissent would adopt a different construction of the waiver and uphold it as constitutional, as did a majority of a separate panel of this court in *People v. Garcia* (March 21, 2014, H039603) [2014 WL 1116998] (*Garcia*). Under this interpretation, the condition would allow the state to require the probationer to answer questions as part of the sex offender management program and polygraph examinations, but the state would be prohibited from using those statements against the probationer in a separate criminal prosecution.

We would agree that it is reasonable to construe the waiver as applying only to statements the probationer makes in the course of the sex offender management program

27

and polygraph examinations.[21]  But even limited to that context, the statute still requires a "waiver of any privilege against self-incrimination" as to those statements.  (§ 1203.067, subd. (b)(3).)  Basic statutory construction requires us to interpret the phrase "any privilege against self-incrimination" in accord with the well-established definition of that privilege as set forth in Fifth Amendment jurisprudence.  "[W]hen a word used in a statute has a well-established legal meaning, it will be given that meaning in construing the statute.  This has long been the law of California: 'The rule of construction of statutes is plain.  Where they make use of words and phrases of a well-known and definite sense in the law, they are to be received and expounded in the same sense in the statute.' " (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 19 [quoting *Harris v. Reynolds* (1859) 13 Cal. 514, 518].)  Without a doubt, the privilege against self-incrimination is well-established and definite under the Fifth Amendment.  Thus, the plain language of the statute unambiguously includes any waiver of the probationer's rights under the Self-Incrimination Clause.

Furthermore, as set forth above, the "core" right of the Self-Incrimination Clause protects against the use of compelled statements in a criminal proceeding against the speaker.  (*Chavez*, *supra*, 538 U.S. at pp. 766-773 (plur. opn. of Thomas, J.); *Maldonado*, *supra*, 53 Cal.4th at p. 1128.)  Any condition excluding the core of the waived right from the waiver would require some indication of that exclusion in its language.  No such language is found in the waiver condition here, explicit or implicit.  To the contrary, the statute's use of the word "any" explicitly defines the waiver to include all aspects of the privilege; this necessarily includes the core right.

---

[21] The dissent reads our opinion as considering a broader construction of the waiver that would apply it to any statement by the probationer, whether or not it is made in the context of the sex offender management program or polygraph exams.  We address the narrower construction—applying the waiver only to statements made during that context—above at pages 21-23.  We conclude the waiver is unconstitutional under either construction.

Both the dissent and the majority in *Garcia* conclude that the Legislature intended only to require probationers to participate fully in the sex offender management program, and not to allow their statements to be used against them in separate criminal proceedings.[22] But the most reliable indicator of legislative intent is the plain language of the statute. (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818.) When "the statute's text evinces an unmistakable plain meaning, we need go no further." (*Beal Bank, SSB v. Arter & Hadden, LLP* (2007) 42 Cal.4th 503, 508.) The plain language of the statute does not support the construction advanced by the dissent and by the majority in *Garcia*. Moreover, that construction would render the waiver unnecessary. As the United States Supreme Court made clear, the Fifth Amendment already allows the state to require probationers to answer questions as a condition of probation, provided those statements are not used against the probationer in a criminal prosecution. (*Murphy*, *supra*, 465 U.S. at p. 427.) "[I]t is well established that incriminating answers may be officially compelled, without violating the privilege, when the person to be examined receives immunity 'coextensive with the scope of the privilege'—i.e., immunity against both direct and 'derivative' criminal use of the statements." (*Spielbauer*, *supra*, 45 Cal.4th at pp. 714-715.)

The dissent construes the statute as limited to requiring a waiver of the right to refuse to answer questions during polygraph examinations and any other part of the sex offender management program. And the *Garcia* majority views the waiver provision as "critical" because it prevents a probationer from refusing to answer questions on self-incrimination grounds. (*Garcia*, *supra*, at pp. 5, 17.) But the privilege against self-incrimination does not prohibit the State from compelling statements, provided the

---

[22] Other language in the statute already requires probationers to "participate in" and "successfully complete" the sex offender management program, requiring them to engage in treatment and participate in polygraph exams. (§ 1203.067, subds. (b)(1), (b)(2) & (b)(3).)

29

probationer retains immunity. Neither the dissent nor the *Garcia* majority explain the necessity of requiring a waiver when the probationer can already be compelled to answer questions, as described in *Speilbauer*. Such a construction violates the basic rule that no part of a statute shall be construed to be " 'inoperative or superfluous, void or insignificant.' " (*AFL-CIO v. Deukmejian* (1989) 212 Cal.App.3d 425, 435 [quoting 2A Sutherland, Statutory Construction (4th ed. 1984) § 46.06, p. 104].) We are mindful of the rule that courts should construe statutes, "*when reasonable*, to avoid difficult constitutional questions." (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1105.) (Italics added.) But that principle does not allow us to adopt a construction that controverts the plain language of the statute.

Finally, the statutory construction advanced by the dissent and by the majority in *Garcia* raises two additional concerns. First, no reasonable defendant can be expected to understand that a "waiver of any privilege against self-incrimination" does not actually mean what it says, but instead means that after waiving the privilege, he or she could nonetheless invoke it at a later time with respect to statements made under the waiver. When "men [or women] of common intelligence must necessarily guess" at a condition's meaning and "differ as to its application," such a condition is vague in violation of due process. (*Connally v. General Const. Co.* (1926) 269 U.S. 385, 391.) Upholding the waiver condition as worded would cause confusion in the law and in the proper administration of defendant's probation. And second, as *Garcia* acknowledges, the effect of the waiver requirement is to grant the probationer automatic use and derivative use immunity for any incriminating statements.[23] (*Garcia*, *supra*, at p. 15.) While the

---

[23] In contrast, by striking the waiver requirement, our holding removes the probationer's statements from the "classic penalty situation" recognized by *Murphy*, *supra*, 465 U.S. at page 435. Thus, unless the probationer explicitly invokes the Fifth Amendment, his statements may be used in a criminal prosecution, as Murphy's statements were used against him.

30

*Garcia* majority downplays the significance of this result, we think it unnecessarily threatens to hamper future prosecutions. This is not a situation where "the vast majority of such cases are unlikely to have criminal implications." (*Spielbauer*, *supra*, 45 Cal.4th at p. 729.) To the contrary, under the CASOMB standards, polygraph examiners are specifically directed to question probationers—who have already been convicted of at least one offense—about a wide array of other criminal behaviors. And as mandatory reporters, both the polygraph examiners and probation officers may have reporting obligations to law enforcement. There is no disagreement that compelled statements cannot be used in separate criminal proceedings; therefore, prosecutors wishing to pursue charges for these offenses will be required to disprove any taint.

C. *Overbreadth of the Polygraph Examinations Requirement*

Defendant, relying on *Brown*, *supra*, 101 Cal.App.4th 313, challenges as overbroad the condition requiring him to participate in polygraph examinations as part of the sex offender management program. The defendant in *Brown* was convicted of stalking. The trial court imposed a probation condition identical to the condition here, ordering Brown to complete a stalking therapy program and submit to periodic polygraph examinations as conditions of his probation. (*Id.* at pp. 317, 319.) The court of appeal held that mandatory polygraph testing as a condition of probation was reasonably related to the defendant's stalking conviction and to possible future criminality under *People v. Lent* (1975) 15 Cal.3d 481. (*Brown*, *supra*, 101 Cal.App.4th at p. 319.) But the court further held that the probation condition must be narrowed under *Lent* "to limit the questions allowed to those relating to the successful completion of the stalking therapy program and the crime of which Brown was convicted." (*Id.* at p. 321.)

Application of the *Lent* factors here leads us to the same conclusion. Under *Lent*, "A condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future

31

criminality. . . .' [Citation.] Conversely, a condition of probation which requires or forbids conduct which is not itself criminal is valid if that conduct is reasonably related to the crime of which the defendant was convicted or to future criminality." (*People v. Lent*, *supra*, 15 Cal.3d at p. 486, fn. omitted.) Here, the basic requirement that Friday participate in polygraph examinations does not run afoul of the *Lent* factors, provided the questions posed to him are reasonably related to his successful completion of the sex offender management program, the crime of which he was convicted, or related criminal behavior, whether past or future. The CASOMB regulations provide examples of many such questions. For example, questions about the probationer's sexual pre-occupations or history of sexual deviancy would be reasonably related to future criminality and the circumstances of the underlying offense.

However, neither the language of the probation condition nor the CASOMB regulations place any limits on the types of questions that may be posed to the probationer. There is no requirement that the questions be related to any criminal conduct, whether past, present, or future. Nor is there any requirement that the questions be limited to successful completion of the sex offender management program. Under the probation condition imposed here, a polygraph examiner could ask Friday anything at all, without limitation. For example, a polygraph examiner could question Friday about his medical history or personal financial matters having nothing to do with any criminal conduct. Such questions would have no reasonable connection to the crime for which he was convicted, no bearing on his completion of the treatment program, and no relevance to future criminality. Under the *Lent* factors, allowing such questions would clearly violate overbreadth principles.

Because the language of subdivision (b)(3) mandates that participation in polygraph examinations "shall be part of the sex offender management program," we will construe this latter condition as imposing the limitations required under *Lent* and *Brown*. Specifically, we construe the requirement of participation in polygraph examinations as

allowing only questions relating to the successful completion of the sex offender management program, the crime of which defendant was convicted, or related criminal behavior. So construed, we uphold this probation condition as sufficiently narrow to satisfy the overbreadth requirements of *Lent*.

D. *Waiver of the Psychotherapist-Patient Privilege*

Section 1203.067, subdivision (b)(4) requires any defendant granted probation under the statute to enter a "Waiver of any psychotherapist-patient privilege to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09." Defendant contends this condition is overbroad in violation of his constitutional right to privacy. We hold that the waiver is constitutional provided it is narrowly construed to require waiver only insofar as necessary "to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09."

1. *Forfeiture of the Claim*

We first consider whether defendant has forfeited this claim by failing to object in the court below. "Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal." (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 880.) "Applying the rule to appellate claims involving discretionary sentencing choices or unreasonable probation conditions is appropriate, because characteristically the trial court is in a considerably better position than the Court of Appeal to review and modify a sentence option or probation condition that is premised upon the facts and circumstances of the individual case." (*Id.* at p. 885.) However, an appellate claim amounting to a "facial challenge" that phrasing or language of a probation condition is unconstitutionally overbroad "does not require scrutiny of individual facts and circumstances but instead requires the review of abstract and generalized legal concepts—a task that is well suited to the role of an appellate court." (*Ibid.*) A challenge to the condition as unconstitutionally overbroad

33

thereby "presents an asserted error that is a pure question of law, easily remediable on appeal by modification of the condition." (*Id.* at p. 888.) Defendant's claim here—a purely facial challenge to the language of the condition as required under the statute—constitutes such a claim. We conclude defendant has not forfeited his claim.

2. *The Psychotherapist-Patient Privilege*

The California Supreme Court has recognized that communications between a patient and psychotherapist are protected by a psychotherapist-patient privilege based on the federal constitutional right to privacy. "The psychotherapist-patient privilege has been recognized as an aspect of the patient's constitutional right to privacy." (*People v. Stritzinger* (1983) 34 Cal.3d 505, 511 (*Stritzinger*).) "We believe that a patient's interest in keeping such confidential revelations from public purview, in retaining this substantial privacy, has deeper roots than the California statute and draws sustenance from our constitutional heritage. In *Griswold v. Connecticut* [(1965)] 381 U.S. 479, 484, the United States Supreme Court declared that 'Various guarantees [of the Bill of Rights] create zones of privacy,' and we believe that the confidentiality of the psychotherapeutic session falls within one such zone." (*In re Lifschutz* (1970) 2 Cal.3d 415, 431-432 (*Lifschutz*).)

More recently, the California Supreme Court has questioned the continuing vitality of the constitutional bases for the psychotherapist-patient privilege. "Although over 40 years have elapsed since our decision in *Lifschutz*, the United States Supreme Court itself has not yet definitively determined whether the federal Constitution embodies even a general right of informational privacy." (*People v. Gonzales* (2013) 56 Cal.4th 353, 384 (*Gonzales*).) Following the lead of the United States Supreme Court in *Whalen v. Roe* (1977) 429 U.S. 589 and *NASA v. Nelson* (2011) ___ U.S. ___ [131 S.Ct. 746], our high court in *Gonzales* merely assumed, without deciding, that such a right exists. (*Gonzales*, *supra*, 56 Cal.4th at p. 385.) Regardless of the analytic approach taken by these courts, no court has yet overruled the holdings of *Lifschutz* and

*Stritzinger*. We remain bound by them. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.) Accordingly, we will proceed under the assumption that defendant enjoys the right to a psychotherapist-patient privilege based on his federal constitutional privacy rights.

"It is also well established, however, that the right to privacy is not absolute, but may yield in the furtherance of compelling state interests." (*Stritzinger*, *supra*, 34 Cal.3d at p. 511.) In *Stritzinger*, the court began by considering the state's "competing interest" in creating an exception to the privilege. (*Ibid.*) The court reaffirmed the holding of *Lifschutz* that any such exception must be narrowly construed, *ibid.*, "concomitant with the purposes of the exception." (*Lifschutz*, *supra*, 2 Cal.3d at p. 435.) These principles resemble the tailoring analysis in which a court considers whether a probation condition imposing limitations on a person's constitutional rights is closely tailored to the purpose of the condition. (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.)

In *Gonzales*, *supra*, 56 Cal.4th 353, the California Supreme Court recently considered the psychotherapist-patient privilege in the context of a proceeding under the Sexually Violent Predator Act (SVPA). The defendant, Ramiro Gonzales, had been convicted of multiple sex offenses over a 20-year period. (*Id.* at p. 358.) Gonzales was paroled in 2004 and he underwent psychological evaluation and treatment as a condition of parole. (*Id.* at p. 359.) After violating his parole conditions several times—including one incident in which he visited a children's playground—Gonzales was arrested and taken into custody. (*Id.* at pp. 359-360.) In 2006, the prosecution petitioned to commit Gonzales under the SVPA, and the matter was set for a jury trial.

Before trial, the prosecution sought to subpoena psychological records arising out of Gonzales' psychological treatment as a parolee. (*Gonzales*, *supra*, 56 Cal.4th at p. 361.) Gonzales moved to quash the subpoena on the basis the records were protected under the psychotherapist-patient privilege, partly relying on *Story v. Superior Court* (2003) 109 Cal.App.4th 1007 (*Story*) [psychotherapy records relating to therapy sessions

35

engaged in as a condition of probation were protected by the statutory psychotherapist-patient privilege and could not be obtained by a prosecutor who sought the records for use in a subsequent murder prosecution].)  The California Supreme Court distinguished between Gonzales' statutory claim under *Story* and his claim under the federal constitutional right to privacy.  "[W]e believe that in order to properly distinguish the federal constitutional issue from the state law issue, it is necessary, in determining whether the disclosure of defendant's therapy records and the admission of his therapist's testimony violated a federal constitutional right of privacy, to look to the specific nature and extent of the federal constitutional privacy interests that are actually implicated in this particular setting and to the permissible state law interests that would support the disclosure and admission of testimony in question in such a setting." (*Gonzales*, *supra*, 56 Cal.4th at p. 386.)

In this analysis, the court first noted that the constitutional privacy right invoked by Gonzales arose under the conditions of parole, and under the care of a psychotherapist funded by the state.  (*Gonzales*, *supra*, 56 Cal.4th at p. 386.)  The court then observed that "the federal Constitution grants states considerable leeway to impose very substantial limitations on the right of privacy retained by persons who are released on parole," citing *Samson v. California* (2006) 547 U.S. 843 (federal Constitution does not preclude a state from authorizing a search of a parolee at any time or place even in the absence of reasonable suspicion).  Balanced against this "limited intrusion" of the privacy right at issue, the court held "the state has a particularly strong and legitimate interest in authorizing the disclosure and use of a parolee's prior statements that occur in parole-mandated therapy in a subsequent SVPA proceeding, especially when, as here, the parole-mandated therapy was occasioned by the parolee's prior conviction of a sex offense." (*Gonzales*, *supra*, 56 Cal.4th at pp. 387-388.)  The court held disclosure was therefore supported by "a legitimate and substantial state interest," such that Gonzales'

36

federal constitutional right to the psychotherapist-patient privilege was not violated by the release of his psychological records. (*Id.* at p. 388.)

### 3. *Application to the Waiver Under Section 1203.067, Subdivision (b)(4)*

Consistent with the above principles, we consider the purpose of the waiver of the psychotherapist-patient privilege at issue here and the state's interest in compelling disclosure under it. Unlike the language of subdivision (b)(3), which mandates waiver of any privilege against self-incrimination, the wording of subdivision (b)(4) explicitly sets forth the purposes of the waiver of the psychotherapist-patient privilege: "to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09." Section 290.09, in turn, requires communication between the sex offender management professional and the probation officer for two purposes. First, the sex offender management professional must provide the supervising probation officer with the probationer's scores on the SARATSO risk assessment tools. (§ 290.09, subd. (b)(2).) Second, the sex offender management professional must communicate with the probation officer about the probationer's "progress in the program and dynamic risk assessment issues." (§ 290.09, subd. (c).) By these provisions, the purposes of the psychotherapist-patient privilege waiver are expressly limited and comparatively well defined.

We find that the state's interest in furthering such communication is legitimate and substantial. The overriding goal of the Containment Model approach underlying the sex offender management program is public safety and the reduction of recidivism. The functioning of the model hinges in large part on open communication between the probation officer and the psychotherapist. (Cal. Sex Offender Management Bd., Sex Offender Treatment Program Certification Requirements, *supra*, at pp. 6-8.) Furthermore, probationers, like the parolee in *Gonzales*, are inherently subject to a greater degree of intrusion on their rights of privacy. (*United States v. Knights*, *supra*,

37

534 U.S. at p. 119.)  Accordingly, we conclude the state has a sufficiently substantial interest in communication between these participants to justify disclosure here.

We next consider whether the scope of the waiver is properly tailored to this interest, or whether the waiver must be more narrowly construed concomitant with the purposes of the exception.  (*Stritzinger*, *supra*, 34 Cal.3d at p. 511; *Lifschutz*, *supra*, 2 Cal.3d at p. 435; *In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.)  Similar to the broad language used in the waiver of the privilege against self-incrimination, the language of the statute, read literally, requires the waiver of "*any* psychotherapist-patient privilege," regardless of the subject matter of the communication or the level of risk to public safety absent disclosure.  The waiver does not distinguish between comparatively more dangerous or less dangerous probationers.  But unlike the language of the waiver of the privilege against self-incrimination, this broad language is followed by the phrase "to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09."  This additional language limits what may be done with the probationer's communications once they are revealed.

We will therefore narrowly construe the statute as requiring a waiver of the psychotherapist-patient privilege only insofar as it is necessary "to enable communication between the sex offender management professional and supervising probation officer . . . ."  (§ 1203.067, subd. (b)(4).)  Specifically, we hold that defendant may constitutionally be required to waive the psychotherapist-patient privilege only to the extent necessary to allow the sex offender management professional to communicate with the supervising probation officer.  Furthermore, the supervising probation officer may communicate defendant's scores on the SARATSO risk assessment tools to the Department of Justice to be made accessible to law enforcement as required under section 290.09, subdivision (b)(2).  This narrow interpretation of the statute allows the psychotherapist to communicate with the probation officer as necessary, furthering the purposes of the exception as set forth in the statute.  Apart from these exceptions, neither

the psychotherapist nor the probation officer may relay protected communications to some other third party under the waiver, and defendant's privacy rights based on the psychotherapist-patient privilege otherwise remain intact.

The parties invite us to create various limitations on the subject matter of the communications that should come under the waiver. The Attorney General argues we should limit the waiver to communications "related to the furtherance of the defendant's successful completion of the sex offender management program, his/her current probation supervision period, his/her sexual history, and state-mandated assessments of his/her risk of reoffending." Defendant argues we should limit the waiver to "subjects necessary for rehabilitation." We decline to impose such limits because it is unclear exactly what statements would be waived under such standards, rendering the probation condition too vague for notice purposes. (*Connally v. General Construction Co.*, *supra*, 269 U.S. 385, 391 [a statute that either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates due process of law].) Arguably, the type of mandated communication as set forth in section 290.09—e.g., communication about probationer's "progress in the program and dynamic risk assessment issues"—implies such limits on the subject matter of communications that may come under the waiver. But absent a specific assertion about a given statement made by the probationer under specific factual circumstances, it would be premature and speculative for this court to impose further limits.

Defendant relies on *Story*, *supra*, 109 Cal.App.4th 1007, *In re Pedro M.* (2000) 81 Cal.App.4th 550 (disapproved in *Gonzales*, *supra*, 56 Cal.4th 353), and *In re Corona* (2008) 160 Cal.App.4th 315. Those cases concerned a defendant's statutory right to a psychotherapist-patient privilege under Evidence Code sections 1012 and 1014. Consistent with the California Supreme Court's analysis in *Gonzales*, *supra*, 56 Cal.4th at

39

page 386, we find defendant's reliance on these cases unavailing with respect to his federal constitutional claim.[24]

E. *Scienter Requirements*

Defendant contends three of the probation conditions are unconstitutionally vague absent a scienter requirement. As to the condition that he not purchase or possess any pornographic or sexually explicit material as it relates to minors, he argues it is unconstitutionally vague because he could unknowingly be in possession of such material. Similarly, as to the condition that he not possess or use any data encryption technique program, he contends it is invalid because he could unknowingly use or be in possession of such a program. As to the condition that he not frequent, be employed by, or engage in any business where pornographic materials are openly exhibited, he contends it requires a knowledge element because he may unwittingly enter an establishment without knowing pornographic materials are exhibited there. Defendant also challenges the use of the term "frequent" in this last condition as being unconstitutionally vague.

Defendant only objected to the first of these three probation conditions in the trial court. Nonetheless, we will consider the merits of his claims as to all three conditions. These claims are facial challenges concerning pure issues of law, and as such, they are not forfeited by the failure to object below. (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 889.)

Regarding the first condition, defendant argues that he may unknowingly come into possession of pornographic or sexually explicit material as it relates to minors. To be constitutionally adequate, he argues, the probation condition must be modified to

---

[24] We understand defendant's claim regarding the psychotherapist-patient privilege as relying solely on federal constitutional grounds. Although he cites to cases concerning the statutory basis for the privilege, he does not cite to or rely on relevant statutory authority for the psychotherapist-patient privilege in his briefs.

prohibit only knowing possession or purchase of pornography or sexually explicit material as it relates to minors.  We agree.

"[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' " (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.)  "A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness." (*Ibid.*)  That is, the defendant must know in advance when he may be in violation of the condition.  "[T]he law has no legitimate interest in punishing an innocent citizen who has no knowledge of the presence of a [prohibited item]." (*People v. Freitas* (2009) 179 Cal.App.4th 747, 752 [modifying probation condition to prohibit knowing possession of a firearm or ammunition].)  Accordingly, courts have consistently ordered modification of probation conditions to incorporate a scienter requirement where a probationer could unknowingly engage in the prohibited activity.  (*In re Victor L.* (2010) 182 Cal.App.4th 902, 912-913 [modifying probation condition to prohibit knowing presence of weapons or ammunition]; *In re Justin S.* (2001) 93 Cal.App.4th 811, 816 [modifying prohibition on association with gang members to prohibit association with known gang members]; *In re Kacy S.* (1998) 68 Cal.App.4th 704, 713 [modifying probation condition that defendant not associate with any persons not approved by his probation officer]; *People v. Lopez* (1998) 66 Cal.App.4th 615, 629 [modifying probation on displaying gang-related indicia].)

It is possible that defendant could come into possession of prohibited material without knowing it.  For example, another person could leave pornographic or sexually explicit material relating to minors in defendant's car or house without his knowledge.  Or he could pick up a book or a magazine without knowing it contains prohibited material.  To enforce a probation violation for unknowing possession of the prohibited materials would violate the principles above.  Therefore, we will modify this probation

41

condition to prohibit knowing possession or purchase of pornographic or sexually explicit material as it relates to minors.

Similarly, it is possible defendant could unknowingly use or possess a data encryption technique program. Indeed, given that data encryption is ubiquitous in modern computer technology, it is likely that he would. Accordingly, we will modify this probation condition to prohibit knowing use or possession of a data encryption technique program.

Finally, we consider the condition that defendant not frequent, be employed by, or engage in any business where pornographic materials are openly exhibited. Defendant argues the condition should be modified to prohibit "visit[ing] or remain[ing] in any business where you know or which your probation officer informs you is a place where pornographic materials are openly exhibited." We agree with defendant that the term "frequent" is unconstitutionally vague, as this court has previously held. (*People v. Leon* (2010) 181 Cal.App.4th 943, 952 (*Leon*) [term "frequent" is unconstitutionally vague]; *In re H.C.* (2009) 175 Cal.App.4th 1067, 1072 [term "frequent" is obscure and susceptible to multiple meanings].) Consistent with this court's modification of the term in *Leon*, we substitute the phrase "visit or remain in" for the term "frequent." Furthermore, because defendant could unknowingly visit a business where prohibited materials are openly exhibited, we will incorporate a scienter requirement into the condition.

### III.  DISPOSITION

In light of our holding that the waiver requirement in Penal Code section 1203.067, subdivision (b)(3) is unconstitutional, we strike the language "waive any privilege against self-incrimination and" from the probation condition implementing that subdivision. Defendant's probation conditions are further modified as follows: (1) the condition prohibiting possession or purchase of pornographic or sexually explicit material as it relates to minors is modified to prohibit knowing possession or purchase of pornographic or sexually explicit material as it relates to minors; (2) the condition

42

prohibiting use or possession of a data encryption technique program is modified to prohibit knowing use or possession of a data encryption technique program; and (3) the condition that defendant not frequent, be employed by, or engage in any business where pornographic materials are openly exhibited is modified to prohibit visiting, remaining in, being employed by, or engaging in any business where defendant knows that pornographic materials are openly exhibited.  As modified, the judgment is affirmed.


_____

MÁRQUEZ, J.


I CONCUR:




_____

GROVER, J.


43

BAMATTRE-MANOUKIAN, J., Concurring and Dissenting

## I.    INTRODUCTION

Defendant Jeffrey David Allen Friday pleaded no contest to possession of matter depicting a person under 18 years of age personally engaging in or simulating sexual conduct.  (Pen. Code, § 311.11, subd. (a).)[1]

At the sentencing hearing held on February 25, 2013, defendant was placed on probation for three years, ordered to serve six months in jail, and required to register as a sex offender.  (See § 290, subd. (c).)  The trial court also imposed a number of probation conditions as required by section 1203.067, subdivision (b).  Defendant was ordered to successfully "complete an approved sex offender management program, following the standards developed pursuant to Section 9003."  (See § 1203.067, subd. (b)(2).)  Defendant was required to "waive any privilege against self-incrimination and participate in polygraph examinations, which shall be part of the sex offender management program."  (See § 1203.067, subd. (b)(3).)  Defendant was required to "waive any psychotherapist-patient privilege to enable communication between the sex offender management professional and the Probation Officer, pursuant to . . . Section 290.09."  (See § 1203.067, subd. (b)(4).)

Defendant now challenges the probation conditions imposed pursuant to section 1203.067, subdivisions (b)(3) and (b)(4).  He contends both probation conditions are overbroad, and he contends the probation condition requiring him to waive the privilege against self-incrimination conflicts with the Fifth Amendment to the United States Constitution.[2]

---

[1] Unspecified section references are to the Penal Code.

[2] The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  (See also Cal. Const., art. I, § 15 ["Persons may not . . . be compelled in a criminal cause to be a witness against themselves . . . ."].)

I agree with the majority that the probation condition imposed pursuant to section 1203.067, subdivision (b)(4), which requires a waiver of the psychotherapist-patient privilege, is not overbroad and does not require modification.

I also agree with the majority that the section 1203.067, subdivision (b)(3) probation condition is not overbroad insofar as it requires defendant to "participate in polygraph examinations" as part of the sex offender management program. However, I respectfully disagree with the majority's conclusion that the language "waive any privilege against self-incrimination" must be stricken from the probation condition required by section 1203.067, subdivision (b)(3). As explained below, I respectfully disagree with the majority that the probation condition, as written, violates the Fifth Amendment and is overbroad.

The trial court also imposed other conditions of probation that defendant challenges as overbroad. Specifically, defendant challenges the probation conditions requiring him not to (1) "purchase or possess any pornographic or sexually explicit material as defined by [the] probation officer as it relates to minors," (2) "frequent, be employed by, or engage in any business where pornographic materials are open[ly] exhibited," and (3) "possess or use any data encryption technique program." The majority opinion holds that these three conditions must be modified to include a knowledge element, and that the second condition must be modified to replace the word "frequent" with the phrase "visit or remain in." I concur in that portion of the majority opinion.

## II. DISCUSSION

### A. *Statutory Background*

In the Sex Offender Punishment, Control, and Containment Act of 2006 (§ 290.03), the "Legislature [found] and declare[d] that a comprehensive system of risk assessment, supervision, monitoring and containment for registered sex offenders

2

residing in California communities is necessary to enhance public safety and reduce the risk of recidivism posed by [sex] offenders." (§ 290.03, subd. (a).)

In 2010, the Legislature amended section 1203.067, subdivision (b) as part of a bill aimed at expanding the "Containment Model" approach to sex offender risk management. (Stats. 2010, ch. 219, § 17, eff. Sept. 9, 2010; see Sen. Com. on Public Safety, Bill Analysis of Assem. Bill No. 1844 (2009-2010 Reg. Sess.) June 29, 2010.) "The Containment Model calls for a collaborative effort of sex offender specific treatment providers, law enforcement supervising agents such as probation officers or parole agents, polygraphists providing specialized testing as both a treatment and monitoring tool and victim advocacy participants whenever possible. The offender is supervised and overseen within this context." (Sen. Com. on Public Safety, Bill Analysis of Assem. Bill No. 1844 (2009-2010 Reg. Sess.) June 29, 2010.)

As amended, section 1203.067, subdivision (b) requires that sex offenders participate in a sex offender management program as a condition of probation. The statute requires that such probationers waive "any privilege against self-incrimination and participat[e] in polygraph examinations, which shall be part of the sex offender management program." (§ 1203.067, subd. (b)(3).) Additionally, such probationers must waive "any psychotherapist-patient privilege to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09." (§ 1203.067, subd. (b)(4).) The new requirements apply to persons placed on probation for certain sex offenses "[o]n or after July 1, 2012." (§ 1203.067, subd. (b).) The legislative history of these "specified conditions of supervised probation" notes that "[v]arious studies on the effectiveness of containment models in other states ha[d] shown positive results in recidivism reduction." (Sen. Appropriations Com., Bill Analysis of Assem. Bill No. 1844 (2009-2010 Reg. Sess.) Aug. 12, 2010.)

**B.      *Section 1203.067, Subdivision (b)(3) Probation Condition***

As a condition of probation, defendant was required to "waive any privilege against self-incrimination and participate in polygraph examinations, which shall be part of the sex offender management program."  (See § 1203.067, subd. (b)(3).)

Defendant argues that this probation condition conflicts with the Fifth Amendment and is overbroad, because it prohibits him from invoking the privilege against self-incrimination.  In his briefing, defendant contended that the condition should be modified to specify that he is "required to cooperate with the sex offender management program to the extent it does not interfere with his Fifth Amendment privilege against self-incrimination."  At oral argument, defendant argued that the language "waive any privilege against self-incrimination" should be stricken from the probation condition.

Defendant also argues this condition is overbroad because it "does not limit the scope of the questions being asked as part of the polygraph examination to those related to the successful completion of the therapy or compliance with the conditions of probation . . . ."

The majority agrees with defendant that the probation condition required by section 1203.067, subdivision (b)(3) "is prohibited by the Fifth Amendment" insofar as it requires him to waive "any privilege against self-incrimination," but concludes that the probation condition is not overbroad with respect to the polygraph testing requirement.  (Maj. opn. at pp. 1, 9.)  The majority orders the language "waive any privilege against self-incrimination" stricken from the probation condition.  (Maj. opn. at p. 42.)

For the reasons discussed below, I do not believe that the language "waive any privilege against self-incrimination" should be stricken from the probation condition required by section 1203.067, subdivision (b)(3) or that the probation condition should be modified in any other respect.

## 1. Scope of the Waiver of the Privilege Against Self-Incrimination

Both parties in this case appear to believe the waiver of the privilege against self-incrimination required by section 1203.067, subdivision (b)(3) applies only during polygraph examinations administered as part of the sex offender management program. Defendant construes the condition as requiring him "to answer all questions put to him in the course of a polygraph examination which he may not refuse."

The majority believes that the section 1203.067, subdivision (b)(3) probation condition requires defendant to answer questions about any topic, at any time, not just questions asked during polygraph examinations or during other aspects of the sex offender management program. (See maj. opn. at p. 20.) I understand the majority opinion to find that, even if the condition applies only during the course of the sex offender management program, defendant still could be asked—and required to answer— questions that do not relate to the program.

In interpreting the scope of the probation condition mandated by section 1203.067, subdivision (b)(3), we must apply settled rules of statutory construction. " ' "The goal of statutory construction is to ascertain and effectuate the intent of the Legislature. [Citation.] Ordinarily, the words of the statute provide the most reliable indication of legislative intent. [Citation.] When the statutory language is ambiguous, the court may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes. [Citations.]" [Citation.] " 'When the language is susceptible of more than one reasonable interpretation . . . , we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " [Citation.]' [Citations.]" (*People v. Kennedy* (2011) 194 Cal.App.4th 1484, 1490-1491 (*Kennedy*).) Further, we must construe a statute in a manner that ensures its

5

constitutionality, if possible. (See *People v. Lowery* (2011) 52 Cal.4th 419, 427 (*Lowery*).)

Here, the plain language of the statute indicates that the waiver of the privilege against self-incrimination applies only to statements made in response to questions asked as "part of the sex offender management program." (§ 1203.067, subdivision (b)(3).) The compound subject "[w]aiver of any privilege against self-incrimination and participation in polygraph examinations" is modified by the phrase "which shall be part of the sex offender management program." (*Ibid.*) I believe that a waiver of the privilege against self-incrimination is thus required only as "part of the sex offender management program." (*Ibid.*)

In light of the overall statutory scheme and the legislative history of section 1203.067, to the extent there is any ambiguity in the language of the statute, I would conclude that the Legislature intended to require that probationers waive the privilege against self-incrimination only in the context of the sex offender management program. Section 1203.067, subdivision (b) applies to probationers who are also required to register as sex offenders under section 290, and the Legislature has previously recognized that those persons are " ' " 'likely to commit similar offenses in the future. [Citation.]' " ' " (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1196.) Thus, in enacting section 1203.067, subdivision (b), the Legislature recognized that it is appropriate to grant probation to a sex offender only if the risks can be managed, and that participation in a sex offender management program will help manage those risks. Since the Legislature's intent was to manage the risk of recidivism posed by sex offenders by compelling their participation in a sex offender management program, there is no basis for construing the statute as mandating a "[w]aiver of any privilege against self-incrimination and participation in polygraph examinations" (§ 1203.067, subdivision (b)(3)) as to questions asked for any purpose other than as "part of the sex offender management program."

I respectfully disagree with the majority's determination that "[b]y use of the word 'any' to modify the term 'privilege,' the statute precludes all attempts by a probationer, present and future, to seek protection under the Self-Incrimination Clause for compelled statements made during the sex offender management program, regardless of the circumstances in which they may arise." (Maj. opn. at p. 20.) I believe that by using the term "any" to modify the phrase "privilege against self-incrimination" (§ 1203.067, subd. (b)(3)), the Legislature simply intended to specify that a probationer could not claim the privilege against self-incrimination under *any source*, such as the Fifth Amendment or the state constitution. (See Cal. Const., art. I, § 15; Evid. Code, § 940.) To the extent the meaning of the term "any" is ambiguous, this construction of the statute effectuates the Legislature's intent to require that probationers waive the privilege against self-incrimination only in the context of the sex offender management program (see *Kennedy, supra,* 194 Cal.App.4th at pp. 1490-1491) and ensures the statute's constitutionality. (See *Lowery, supra,* 52 Cal.4th at p. 427.)

In sum, I would interpret the probation condition required by section 1203.067, subdivision (b)(3) as requiring a probationer to waive the privilege against self-incrimination only as to questions asked as "part of the sex offender management program." That is, a probationer may not assert the privilege against self-incrimination as grounds for refusing to answer questions during polygraph examinations that are administered as part of the sex offender management program, nor during any other part of the sex offender management program, such as treatment and risk assessments. (See § 9003, subd. (b).)

## 2.    Fifth Amendment Analysis[3]

The majority relies primarily on *Minnesota v. Murphy* (1984) 465 U.S. 420 (*Murphy*) to find that the section 1203.067, subdivision (b)(3) probation condition violates the Fifth Amendment and is overbroad.

In *Murphy*, the defendant was subject to a probation condition requiring that he participate in a treatment program for sexual offenders, report to his probation officer as directed, and be truthful with the probation officer " 'in all matters.' " (*Murphy, supra,* 465 U.S. at p. 422.)  In his treatment program, the defendant admitted a prior rape and murder.  (*Id.* at p. 423.)  Those admissions were communicated to the probation officer, who questioned the defendant.  The defendant admitted the crimes to the probation officer, but the defendant then sought to suppress those admissions on the ground that his statements had been compelled by the probation condition.  (*Id.* at pp. 424-425.)

The United States Supreme Court emphasized that in general, the Fifth Amendment is not self-executing:  "a witness . . . ordinarily must assert the privilege rather than answer if he desires not to incriminate himself."  (*Murphy, supra,* 465 U.S. at p. 429.)  The probation condition in *Murphy* only required the defendant to be truthful, and thus the defendant still could have claimed the privilege against self-incrimination. (*Id.* at pp. 436-437.)  The *Murphy* court considered whether there were any applicable exceptions to the general rule that the Fifth Amendment is not self-executing.  (*Id.* at p. 429.)  In particular, the court considered whether to excuse the defendant's failure to

---

[3] The Attorney General contends that defendant's Fifth Amendment challenge to the probation condition is not ripe for review, since "there is no evidence that [defendant] has been asked any polygraph questions that call for answers that would or could incriminate him in a pending or future criminal prosecution."  However, defendant is bringing a facial challenge, which does not require him to show that the condition has yet been enforced.  (See *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 ["A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual."].)

8

assert the privilege against self-incrimination on the basis of the "so-called 'penalty' " exception. (*Id*. at p. 434.)

The penalty exception had been applied in cases where "the State not only compelled an individual to appear and testify, but also sought to induce him to forego the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.' [Citation.]" (*Murphy, supra,* 465 U.S. at p. 434.) In *Murphy*, there was no evidence that the defendant would have been penalized for exercising his Fifth Amendment privilege. (*Id.* at pp. 437-438.) The probation condition itself "proscribed only false statements; it said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." (*Id.* at p. 437.) Further, there was "no direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent." (*Ibid*.)

The *Murphy* court explained how the penalty exception could apply to a probationer: "if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." (*Murphy, supra,* 465 U.S. at p. 435, fn. omitted.) However, the court noted, "a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." (*Ibid.,* fn. 7.)

As applied to this case, *Murphy* establishes that defendant's Fifth Amendment rights are not violated by the probation condition requiring him to waive the privilege against self-incrimination as to questions asked during the sex offender management

9

program.  The state has, "by implication, assert[ed] that invocation of the privilege" in response to such incriminating questions "would lead to revocation" of probation.  (See *Murphy, supra,* 465 U.S. at p. 435.)  Thus, if defendant makes any statements in response to questions posed to him during the sex offender management program, those statements will be deemed compelled under the Fifth Amendment and thus involuntary and inadmissible in a criminal prosecution.  (*Ibid.*)  Since such statements will necessarily fall within the penalty exception, they will not be available for use at a criminal prosecution, and defendant's Fifth Amendment rights have not been violated.  (See *Chavez v. Martinez* (2003) 538 U.S. 760, 769 [plur. opn. of Thomas, J.] [the Fifth Amendment is not violated "absent use of the compelled statements in a criminal case against the witness"]; *id.* at p. 777 [conc. opn. of Souter, J.].)

In sum, because the penalty exception will necessarily apply to statements that defendant makes in response to questions asked as part of the sex offender management program under compulsion of the section 1203.067, subdivision (b)(3) probation condition, the condition itself does not violate the Fifth Amendment.

### 3.    Overbreadth Analysis

"A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad.  [Citation.]"  (*In re Sheena K.* (2007) 40 Cal.4th 875, 890 (*Sheena K.*).)  " 'A statute or regulation is overbroad if it "does not aim specifically at evils within the allowable area of [governmental] control, but . . . sweeps within its ambit other activities that in the ordinary circumstances constitute an exercise" of protected expression and conduct.' [Citations.]"  (*People v. Leon* (2010) 181 Cal.App.4th 943, 951.)  "The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that

10

perfection in such matters is impossible, and that practical necessity will justify some infringement." (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153.)

As noted above, in enacting section 1203.067, subdivision (b), the Legislature recognized that it is appropriate to grant probation to a sex offender only if the risks can be managed, and that participation in a sex offender management program will help manage those risks. More specifically, by enacting section 1203.067, subdivision (b)(3), the Legislature recognized that a waiver of the probationer's privilege against self-incrimination is important to the success of the sex offender management program. The Legislature reasonably concluded that allowing sex offenders on probation to refuse to answer questions would create an unacceptable danger to the community. (See § 290.03, subd. (a)(1) ["Sex offenders pose a potentially high risk of committing further sex offenses after release from incarceration or commitment, and the protection of the public from reoffending by these offenders is a paramount public interest."].) If a sex offender could claim the privilege against self-incrimination during a risk exam, and thereby hide past or new offenses from the treatment team, his or her risk of reoffense could not be correctly calculated or managed. (See, e.g., *People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1214 [actuarial instrument calculated risk of sexual reoffense based on factors including the number of prior sex offenses, convictions for non-sex offenses, and details about sex offenses].) By requiring every sex offender granted probation to make full disclosures and to give up any right to refuse to answer questions posed during polygraph examinations or treatment as part of the sex offender management program, the State greatly enhances its ability to manage the serious risks posed by sex offenders who remain free in the community.

In sum, in light of the legislative intent underlying section 1203.067, subdivision (b)(3), I conclude that any limitations on defendant's Fifth Amendment rights are "closely tailor[ed] . . . to the purpose of the condition" and thus are not "invalid[] as unconstitutionally overbroad. [Citation.]" (*Sheena K., supra,* 40 Cal.4th at p. 890.) The

11

Legislature reasonably determined that a waiver of the privilege against self-incrimination is necessary when a defendant is participating in the sex offender management program as part of his or her probation for a sex offense. The Legislature enacted section 1203.067, subdivision (b)(3) for the purpose of managing and treating sex offenders and protecting the community, not for the purpose of compelling statements to be used in criminal prosecutions. Since the condition only requires waiver of the privilege against self-incrimination as part of the sex offender management program, it is not overbroad.

### 4. Scope of Polygraph Testing

Defendant also challenges the probation condition imposed pursuant to section 1203.067, subdivision (b)(3) insofar as it requires him to "participate in polygraph examinations, which shall be part of the sex offender management program." Defendant argues the condition is overbroad and requests we modify the condition so he is required "to answer only questions reasonably related to the completion of his probation or his criminal conviction."

Defendant relies on *Brown v. Superior Court* (2002) 101 Cal.App.4th 313 (*Brown*), where the defendant was convicted of stalking while a domestic violence restraining order was in effect. The trial court had imposed probation conditions requiring the defendant to participate in a stalking therapy program and undergo " 'periodic polygraph examinations at defendant's expense, at the direction of the probation officer.' " (*Id.* at p. 321.) The Court of Appeal held that the polygraph condition was overbroad, ordering it modified so that the questions asked would be limited to "those relating to the successful completion of the stalking therapy program and the crime of which Brown was convicted." (*Ibid.*)

Here, the probation condition requires defendant to "participate in polygraph examinations, which shall be part of the sex offender management program." (See § 1203.067, subd. (b)(3).) The probation condition does not expressly limit the questions

12

that may be asked during polygraph examinations to those related to the successful completion of the program or defendant's criminal conviction.  However, such a limitation is inherent in the phrase "which shall be part of the sex offender management program."  (*Ibid.*)  In other words, the probation condition requires polygraph examinations to be used only in furtherance of a probationer's treatment, and thus requires that the questions asked be relevant to that treatment.

The majority "construe[s] the requirement of participation in polygraph examinations as allowing only questions relating to the successful completion of the sex offender management program, the crime of which defendant was convicted, or related criminal behavior."  (Maj. opn. at p. 28.)  I similarly conclude that the probation condition need not be modified to expressly state that the questions asked during polygraph examinations must be reasonably related to the completion of defendant's treatment program or his conviction, because such limitations are inherent in the condition.

### 5. Conclusion

In sum, I do not believe the probation condition imposed pursuant to section 1203.067, subdivision (b)(3) is overbroad or that the probation condition violates the Fifth Amendment.  I would not strike any language from this probation condition or otherwise modify the condition.

### C. *Section 1203.067, Subdivision (b)(4) Probation Condition*

Defendant also challenges the probation condition imposed pursuant to section 1203.067, subdivision (b)(4), which requires defendant to waive "any psychotherapist-patient privilege to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09."  Defendant contends this probation condition is overbroad and violates his constitutional right to privacy, because it requires him to "entirely waive the psychotherapist-patient privilege."   He contends the condition should be stricken or modified.  He suggests the

13

condition could be modified to "limit the waiver to subjects necessary for rehabilitation" and to "limit disclosure of otherwise privileged psychotherapist-patient communications to the probation officer and the court."

Section 290.09 mandates certain communication between the probation officer and the certified "sex offender management professionals" who are required to "assess each registered sex offender on formal probation." (§ 290.09, subd. (b)(1).) First, the certified sex offender management professional is required to provide the probation officer with the probationer's scores on required risk assessment tools, and the probation officer is required to send the scores to the Department of Justice. (*Id.*, subd. (b)(2).) Second, the certified sex offender management professional is required to communicate with the probation officer "on a regular basis, but at least once a month, about the offender's progress in the program and dynamic risk assessment issues." (*Id.*, subd. (c).)

Section 1203.067, subdivision (b)(4) mandates that defendant waive the psychotherapist-patient privilege only "to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09." Since section 290.09 is explicitly incorporated by reference, and since section 290.09 limits the subject matter of the communication between the sex offender management professional and the probation officer, I do not believe the condition requires defendant to waive the psychotherapist-patient privilege as to any other subjects. My construction comports with the plain language of the statute, and it also harmonizes the statute with section 290.09. (See *Kennedy, supra,* 194 Cal.App.4th at p. 1490.)

The majority concludes there is no need to modify the probation condition imposed pursuant to section 1203.067, subdivision (b)(4) because it construes the statute "as requiring a waiver of the psychotherapist-patient privilege only insofar as it is necessary 'to enable communication between the sex offender management professional and supervising probation officer . . . .' " (Maj. opn. at p. 38.) I agree there is no need to modify the probation condition imposed pursuant to section 1203.067, subdivision (b)(4).

14

### III. CONCLUSION

For the reasons stated above, I conclude that the probation condition imposed pursuant to section 1203.067, subdivision (b)(3) does not violate the Fifth Amendment and is not overbroad. I further conclude that the probation condition imposed pursuant to section 1203.067, subdivision (b)(4) is not overbroad. Therefore, I would affirm the judgment.

_____
BAMATTRE-MANOUKIAN, J.

| Trial Court: | Santa Clara County |
| Superior Court No.: | C1240683 |
| | |
| Trial Judge: | The Honorable Rene Navarro |

Attorney for Defendant and Appellant
Jeffrey David Allen Friday:

Lori A. Quick
under appointment by the Court of
Appeal for Appellant

Attorneys for Plaintiff and Respondent
The People:

Kamala D. Harris,
Attorney General

Dane R. Gillette,
Chief Assistant Attorney General

Gerald A. Engler,
Senior Assistant Attorney General

Jeffrey M. Laurence,
Supervising Deputy Attorney General

Violet M. Lee,
Deputy Attorney General

People v. Friday
H039404